1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

TRACEY ANNE PARKER,

Plaintiff,

v.

NANCY A. BERRYHILL,
Commissioner of the Social Security
Administration,

Defendant.

Case No. 16-cv-02027-BAS-PCL

**ORDER:**

**(1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 19);**

**(2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 23); AND**

**(3) REMANDING ACTION FOR AWARD OF BENEFITS**

Plaintiff Tracey Anne Parker commenced this action seeking review of the Social Security Commissioner's denial of her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II of the Social Security Act, respectively. The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

Presently before the Court are Plaintiff's Motion for Summary Judgment (ECF No. 19) and Defendant's Cross-Motion for Summary Judgment (ECF No. 23).

Plaintiff moves for summary judgment on grounds that the Administrative Law Judge ("ALJ") committed a reversible error by improperly rejecting a treating physician's medical opinion and improperly weighing a non-examining physician's opinion. (Pl.'s Mot. at 2:13-3:1.) Plaintiff requests that the Court remand her case for the payment of benefits or, alternatively, further administrative proceedings. (*Id.* at 3:1-3:2.)

However, Defendant argues that upholding the ALJ's decision is appropriate because the ALJ permissibly rejected the treating physician's unsupported statements and thus, properly relied on the non-examining physician's opinion. (Def.'s Mot. at 10:1-4) In the event that the Court overturns the Agency's decision, Defendant requests the Court remand for further administrative proceedings, rather than payment of benefits. (*Id.* at 10:11-13.)

For the reasons that follow, the Court **GRANTS** Plaintiff's Motion for Summary Judgment, **DENIES** Defendant's Motion for Summary Judgment, and **REMANDS** this matter for the immediate calculation and award of benefits.

# I.    BACKGROUND

## A.    Plaintiff's Personal and Medical History

Plaintiff alleges that she became disabled on August 31, 2007, at which time she was almost 26 years old. (AR 92.) Plaintiff has past work experience as a vocational specialist, an assistant director at a developmental disabilities day program, and a residential counselor for a group home. (AR 81-85, 262.) Plaintiff had previously stopped working on June 30, 2006, for reasons "unrelated" to the conditions set forth in her disability applications. (AR 261.)

The administrative record and evidence presented at the hearing demonstrate Plaintiff's physical health and the symptoms of her impairments. Plaintiff suffers from frequently occurring severe headaches (AR 1558, 1180, 1196), Chiari I malformation (AR 330), nephrocalcinosis (AR 1405-08), history of cysticercosis

(AR 488-89), degenerative disc disease (AR 488-89, 494), disc bulging on the cervical spine (AR 488-89), obstructive sleep apnea (AR 1546-48, 1532-33), anxiety (AR 976), and obesity (AR 788).

Plaintiff was diagnosed with a Chiari I malformation[1] on August 31, 2007. (AR 330.) To relieve her constant headaches from the Chiari malformation (AR 525), Plaintiff underwent suboccipital cranial decompression and a bilateral laminectomy C1-2 on August 9, 2010. (AR 1355.) Plaintiff experienced cerebral spinal fluid ("CSF") leakage from the cranial decompression, and on September 7, 2010, her neurologist inserted a lumboperitoneal shunt to decrease CSF pressure and allow her decompression graft to heal. (AR 510, 1298-99). On February 22, 2011, Plaintiff underwent exploration for repair of a dural leak (AR 1278-81) to treat her "persistent CFS leak" (AR 500).

Following her multiple surgeries, Plaintiff made numerous trips to the Fallbrook and Palomar Emergency Departments complaining of head pain, headaches, and back pain in the area of her shunt. (*See, e.g.*, AR 1199 (visit on October 30, 2012), AR 1178 (visit on December 7, 2012), AR 1156 (visit on June 16, 2012), AR 1133, 1143 (two visits on July 1, 2013)). After examinations, admitting physicians diagnosed Plaintiff with acute cephalgia (headache) and vomiting (AR 1180), acute severe headache (AR 1196), headache and neck pain (AR 1141), and dizziness and generalized weakness (AR 133). During those visits, she received pain management treatment and was discharged. (AR 1196, 1170, 1157, 1262, 1145.)

//

---

[1] "Chiari malformations are structural defects in the base of the skull and cerebellum, the part of the brain that controls balance. Normally the cerebellum and parts of the brain stem sit above an opening in the skull that allows the spinal cord to pass through it (called the foramen magnum). When part of the cerebellum extends below the foramen magnum and into the upper spinal canal, it is called a Chiari malformation." *Chiari Malformation Fact Sheet*, Nat'l Inst. of Neurological Disorders & Stroke (June 2017), https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Chiari-Malformation-Fact-Sheet#6.

### 1. Treating Physicians

#### a. Dr. Mark Stern

Plaintiff began seeing Dr. Mark Stern, a neurosurgeon at the Southern California Institute of Neurological Surgery on April 4, 2010, for "an opinion on possible surgery for decompression of the Chiari I malformation" to resolve her headaches. (AR 523.) At that visit, Dr. Stern noted that Plaintiff reported a "worsening of her symptoms" that made performing daily activities difficult, as "any type of activity seems to aggravate her headaches." (*Id.*) Based on CT scans, Dr. Stern advised Plaintiff on surgery for decompression of the Chiari I malformation. (AR 525.) He noted that Plaintiff wished to proceed with the "complex" and "risk[y]" surgery to relieve her constant headaches, as they "interfere[d] with her normal daily activities" and were "of such severe quality and consistency[.]" (*Id.*)

On August 9, 2010, Plaintiff underwent suboccipital cranial decompression and a bilateral laminectomy C1-2. (AR 1355.) On August 15, 2010, Plaintiff went to the Emergency Room for "excruciating" head and neck pain, exacerbated by movement and position, but left the Emergency Department before receiving treatment. (AR 1219.) Plaintiff proceeded to see Dr. Stern on August 16, 19, and 27, 2010, and was hospitalized again due to post-operative pain, infection, and cerebral spinal fluid ("CSF") leakage. (AR 512-16, 1302-03.)

On September 7, 2010, Dr. Stern inserted a lumboperitoneal shunt to decrease CSF pressure and allow for her decompression graft to heal. (AR 510, 1298-99.) In her post-operative follow-up with Dr. Stern on September 17, 2010, Dr. Stern reported that Plaintiff denied having headaches. (AR 508.) However, on October 22, 2010, in another follow-up appointment after having radiologic aspiration of extra-dural fluid, Plaintiff reported having "a different headache, more on the right side." (AR 503.) A CT aspiration performed on December 15, 2010, "demonstrate[d] two fluid collection pockets," which were also aspirated. (AR 500.)

Plaintiff returned to Dr. Stern's office on January 3, 2011, for her "persistent CSF leak," where she denied having the severe headaches that she had before the decompression surgery, despite the persistent leak. (AR 500.) Weeks later, on February 22, 2011, Plaintiff underwent exploration for repair of a dural leak. (AR 403-06.) After repairing Plaintiff's dural leak (AR 1278-81), Dr. Stern reported on March 10, 2011, that Plaintiff "note[d] improvement over her usual headaches and that she has little to no headaches." (AR 1475.) He concluded that Plaintiff's headaches appeared "well controlled" and recommended that she "continue with her activities as tolerated, with no strenuous physical activities for at least six more weeks." (*Id.*)

However, over a year later, in May 2012, Plaintiff returned to Dr. Stern's office, where James Kimber—Dr. Stern's physician's assistant—assessed neck pain, dizziness, and headaches. (AR 493-94). Based on an x-ray showing abnormal straightening of the cervical spine, Mr. Kimber ordered new imaging studies to assess the Chiari I malformation and degenerative disc disease. (AR 494.) In a return visit on June 8, 2012, Plaintiff completed a checkbox form regarding neck pain and indicated that she "ha[d] headaches almost all the time" and "[could] not do [her] usual work." (AR 491.) After reviewing Plaintiff's MRIs, Mr. Kimber diagnosed her with a mild disc bulging on the cervical spine and recommended physical therapy treatment. (AR 488-89.) He prescribed her a cysticercosis antibody (AR 489, 1423) and sent her for testing for cysticercosis to rule out neurocysticercosis (AR 488-89). On June 20, 2012, she tested negative for neurocysticercosis. (AR 545.)

Plaintiff maintains that because she "was pretty much told by the neurosurgeon, Dr. Stern, that there was nothing really more that they could do for [her]" to treat her headaches, "[she] just continue[s] with the medication through [her] primary" to manage her pain. (AR 51.)

//

//

### b. Dr. David Bridgeman

Dr. David Bridgeman is Plaintiff's primary care physician (AR 43, 51), and he has been treating Plaintiff since June 29, 2009 (AR 1558). In an Impairment Questionnaire regarding Plaintiff's headaches, Dr. Bridgeman indicated that he treats Plaintiff on a monthly basis and has seen Plaintiff numerous times over the course of treating her conditions. (*Id.*)

On July 12, 2013, Plaintiff saw Dr. Bridgeman for a hospital follow-up. (AR 1555.) Dr. Bridgeman noted that Plaintiff was still having daily headaches and nausea, and he noted that she was experiencing "[n]o improvement after seeing [a] pain specialist and getting [an] epidural injection into [her] C-spine." (*Id.*) Plaintiff requested a referral to a neurologist to help manage her headaches, as she had recently had a follow-up with a neurosurgeon who felt that her Chiari surgery was not causing any side-effects. (*Id.*) Dr. Bridgeman noted that they had already "tried NSAIDS, muscle relaxers, narcotics, [and] lidoderm patches . . . without improvement." (*Id.*) At the visit, Dr. Bridgeman performed a physical exam, noting no positive findings. (AR 1555-56.) He then ordered a referral to neurology for a consult. (AR 1556.)

Later, on January 6, 2014, Plaintiff saw Dr. Bridgeman for a follow-up after exacerbated headaches caused her to visit the Emergency Room twice over the course of one weekend. (AR 1542.) Dr. Bridgeman noted that though Plaintiff usually took Percocet and Valium at home, the medications no longer controlled her pain symptoms. (*Id.*) He further noted that Plaintiff had a follow-up with a neurosurgeon, and her imaging showed no "significant abnormality except mild [degenerative disk disease] of the [cervical] spine." (*Id.*) He also noted that injections into her cervical spine did not help her pain, which he recorded as being a 10/10. (*Id.*) In reviewing Plaintiff's systems, he noted that she presented with headache and neck pain. (AR 1544.) To resolve Plaintiff's headaches, he recommended a longer-acting pain medication, and he put Plaintiff on a trial of OxyContin, in conjunction with a prescription for Dilaudid for breakthrough pain. (*Id.*)

On January 13, 2014, Plaintiff saw Dr. Bridgeman for a follow-up from her last visit. Dr. Bridgeman noted that Plaintiff presented with "some improvement with [her] new pain medications," but that her "pain [was] still [at an] 8/10." (AR 1539.) He performed a physical exam and noted that her cervical spine was tender and that her range of motion was affected as she had moderate pain with motion. (AR 1540-41.) To manage her pain from degenerative disk disease and cervical pain, he doubled her OxyContin dosage and instructed her to continue Dilaudid for breakthrough pain. (AR 1541.)

A week later, on January 20, 2014, Plaintiff saw Dr. Bridgeman for another follow-up from her previous visit. (AR 1536.) Dr. Bridgeman noted that Plaintiff presented with "much improve[ment]" to her headaches with the higher OxyContin dosage. (*Id.*) He performed a physical exam and noted no positive findings. (AR 1536-37.) He found her Budd-Chiari syndrome to be stable, and he instructed her to continue her medications for both the Chiari malformation and her chronic pain. (AR 1538.)

A few months later, on April 28, 2014, Dr. Bridgeman completed an Impairment Questionnaire regarding Plaintiff's headaches. (AR 1558.) He opined that Plaintiff's prognosis was "poor" given her conditions of Chiari I malformation, generalized anxiety disorder and depression, and chronic neck pain and headaches. (*Id.*) He characterized Plaintiff's headaches as "[s]everely intense" and identified many symptoms associated with her headaches, including vertigo, nausea/vomiting, malaise, photosensitivity, visual disturbances, mood changes, and "mental confusion/inability to concentrate." (AR 1559.) He identified Plaintiff's headaches as occurring hourly and lasting anywhere from ten minutes to one hour. (*Id.*)

Dr. Bridgeman noted that moving around makes Plaintiff's headaches worse, and that he instructs Plaintiff to take her pain medication when she is experiencing a headache. (AR 1560.) He further indicated that Plaintiff's symptoms and functional limitations were reasonably consistent with the impairments that he described in the

evaluation. (*Id.*) Dr. Bridgeman also advised that Plaintiff's pain and symptoms are "constantly" severe enough to interfere with her attention and concentration. (AR 1561.) He further expects Plaintiff's symptoms to last at least twelve months. (*Id.*)

Not only did Dr. Bridgeman state that Plaintiff is "incapable of even 'low stress'" work, he also indicated that when Plaintiff has a headache, she would typically be prevented from doing even basic work activities. (AR 1562.) Thus, according to Dr. Bridgeman, Plaintiff would likely be absent from work more than three times a month due to her condition. (*Id.*)

Dr. Bridgeman also treated Plaintiff for her obstructive sleep apnea. On August 23, 2013, Plaintiff saw Dr. Bridgeman, complaining of chronic fatigue. (AR 1552.) Dr. Bridgeman performed a physical exam and made a plan to refer Plaintiff for a sleep evaluation. (AR 1554.) On December 20, 2013, Plaintiff had a sleep study evaluation, and an in-home sleep study was ordered. (AR 1546-48.) On January 24, 2014, Plaintiff's sleep study results revealed obstructive sleep apnea, and on February 13, 2014, she was prescribed a continuous positive airway pressure ("CPAP") machine to treat her sleep apnea. (AR 1532-33.)

### 2. Non-Examining Physicians

### a. Dr. Keith Wahl

On September 10, 2012, a physical medical consultant, Dr. Keith Wahl, performed the State agency's initial review of Plaintiff's SSI and DIB claims and completed a Residual Functional Capacity ("RFC") assessment. (AR 101, 116.) No consultative exam was performed (AR 98, 113), and Dr. Wahl opined that Plaintiff's cerebral impairment was "[n]ot severe," as it did "not significantly limit [Plaintiff's] physical or mental ability to do basic work activities." (AR 100-02, 117.) He based this determination on Plaintiff's past medical records, including (i) an MRI scan of Plaintiff's brain taken on September 5, 2012, which he thought "show[ed her] condition was treated" and (ii) Plaintiff's last physical exam, which "show[ed] no

objective functional limitations." (AR 101, 116.) Though Dr. Wahl found that objective medical evidence supported Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her symptoms (AR 102, 117), he recommended a "light" RFC (AR 101, 116). Specifically, Dr. Wahl recommended that Plaintiff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand, walk, or sit for roughly six hours in an eight-hour workday; and push or pull unlimited weight. (AR 103, 118.) Additionally, Dr. Wahl recommended that Plaintiff could occasionally climb ramps or stairs, as well as balance, stoop, kneel, and crawl, but never climb ladders, ropes, or scaffolds. (*Id.*)

### b.      Dr. Dan Funkenstein

In March 2013, after Plaintiff sought reconsideration of the initial denial of benefits, a psychiatric medical consultant, Dr. Dan Funkenstein, determined that Plaintiff's new mental allegations regarding an anxiety disorder were "[n]ot severe" based on her current evaluation. (AR 131, 144.) Dr. Funkenstein's determination was made based upon Plaintiff's past medical record. (AR 130-31, 143-44.) Dr. Funkenstein performed a Psychiatric Review Technique Assessment. (AR 132, 145.) He determined that while Plaintiff has an anxiety-related disorder, it "does not significantly limit [her] physical or mental ability to do basic work activities." (*Id.*) Additionally, Dr. M. Yee, a physical medical consultant, completed a Physical RFC assessment and opined that Plaintiff could occasionally and frequently lift or carry up to ten pounds, stand or walk for two hours, sit for six hours total in an eight-hour workday, and has an unlimited ability to push or pull. (AR 133, 146.) Dr. Yee further determined that Plaintiff could occasionally climb ramps and stairs, as well as balance, stoop, kneel, and crouch, but never climb ladders, ropes, or scaffolds. (AR 134, 147.) Thus, Dr. Yee found that from the alleged onset date of Plaintiff's disability, there was no twelve-month period where sedentary work was precluded. (AR 131, 144.) No consultative examination was performed. (AR 130, 143.)

**B.    Claim Evaluation**

**1.    The Social Security Act's Five-Step Sequential Process for Evaluating Disability Claims**

"The Social Security Act defines disability as 'the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (quoting 42 U.S.C. § 423(d)(1)(A)). "In order to determine whether an applicant is disabled, an ALJ must follow a five-step process." *Dominguez v. Colvin*, 808 F.3d 403, 405 (9th Cir. 2015) (citing 20 C.F.R. § 416.920). If a disability determination can be made at a step in the process, then the ALJ will not go on to the next step. 20 C.F.R. § 404.1520(a)(4). However, if the ALJ cannot find that a claimant is disabled or not disabled at a step, then the ALJ will proceed to the next step. *Id.*

At step one, the ALJ examines whether the claimant performed "substantial gainful activity" during the period of claimed disability. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two and determines whether the claimant has a severe medical impairment, or combination of impairments, that conforms to the duration requirement. *Id.* § 416.920(a)(4)(ii). If the claimant does not have an impairment or combination of impairments that is severe and meets the duration requirement, the claimant is not disabled. *Id.*

If the claimant's impairment is severe and meets the duration requirement, the ALJ proceeds to step three. Here, the ALJ determines whether the severity of the impairment or combination of impairments meets or medically equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, App'x 1. 20 C.F.R. § 404.1520(a)(4)(iii). If the severity meets or equals a listed impairment, then the claimant is disabled. *Id.* If not, then the ALJ must proceed.

Before proceeding to step four, the ALJ evaluates the claimant's RFC "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(a)(4), (e). Here, the ALJ is "responsible for developing [the claimant's] complete medical history" and "consider[s] any statements about what [the claimant] can still do that have been provided by medical sources." *Id.* § 404.1545(a)(3). Then, at step four, the ALJ considers the claimant's ability to do his or her past relevant work, in light of the RFC assessment. *Id.* § 404.1520(a)(4)(iv). If the ALJ determines that the claimant can do his or her past relevant work, then the claimant is not disabled. *Id.* If the ALJ finds that the claimant cannot do his or her past relevant work, then the ALJ proceeds to the final step.

Lastly, at step five, the ALJ determines whether the claimant could make an adjustment to perform other work, given the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ finds that the claimant can make such an adjustment, then the claimant is not disabled; however, if the claimant cannot make the adjustment, then the claimant is disabled. *Id.*

### 2. Plaintiff's Application for Benefits

On June 19, 2012, Plaintiff filed her application for DIB under Title II of the Social Security Act. (AR 237.) Plaintiff then applied for SSI under Title XIX of the Social Security Act on June 25, 2012. (AR 239.) Plaintiff filed her initial claims for disability due to a Chiari I malformation and hydrocephalus. (AR 92, 107.) These claims were initially denied on September 19, 2012 (AR 105, 120), and again upon reconsideration on March 6, 2013 (AR 136, 149).

Plaintiff requested her claims be heard before an ALJ. (AR 163-64.) A hearing was held before ALJ James P. Nguyen on Wednesday, April 16, 2014. (AR 40.) At the hearing, Plaintiff was represented by an attorney. (*Id.*) Plaintiff, her husband, and a vocational expert testified. (*Id.*)

### 3. The ALJ's Application of the Five-Step Disability Analysis

In a decision dated September 16, 2014, the ALJ determined that Plaintiff is not disabled under the meaning of the Social Security Act and therefore is not entitled to benefits. (AR 28.) The ALJ followed the five-step evaluation procedure for determining whether an individual is disabled within the meaning of the Social Security Act. First, the ALJ found Plaintiff had not engaged in substantial gainful activity since her application for SSI benefits, satisfying step one of the five-step sequential disability analysis. (AR 30.)

At step two, the ALJ concluded that Plaintiff has severe impairments as defined by the Social Security Act. (AR 30.) Specifically, the ALJ found that Plaintiff has "headaches, Arnold Chiari I malformation, status post lumboperitoneal shunt and suboccipital cranial decompression, nephrocalcinosis, history of cysticercosis, cervical degenerative disc disease, status post C1-C2 laminectomy and repair of a dural [CSF] leak, obstructive sleep apnea, and obesity." (*Id.*) He concluded those impairments are "severe because they more than minimally affect [Plaintiff's] ability to perform basic work activities." (*Id.*) However, after reviewing the medical evidence, the ALJ concluded the evidence does not support a finding that Plaintiff's mental impairment of anxiety is severe. (AR 31.)

At step three, the ALJ found that Plaintiff's combination of impairments is not severe enough to meet the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, App'x 1.[2] (AR 31.) Before moving on to step four of the analysis, the ALJ determined Plaintiff "has the [RFC] to perform sedentary work . . . except that she can occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds; she can occasionally balance, stoop, kneel, crouch, and crawl; and she

---

[2] Specifically, the ALJ considered Plaintiff's obesity as it contributes to her other impairments (though noting that "obesity is not listed as an impairment"). (AR 31.) The ALJ also considered the following listings: disorders of the spine, 20 C.F.R. Part 404, Subpart P, App'x 1 § 1.04, genitourinary impairments resulting from chronic renal disease, *id.* § 6.00, neurological impairments, *id.* § 11.00, and anxiety related disorders, *id.* § 12.06. (AR 32.) He concluded that Plaintiff's combination of impairments "does not meet or medically equal a listing." (*See id.*)

should avoid working around unprotected heavy machinery or unprotected heights." (AR 32.)

After a two-page summary of Plaintiff's medical record, including various hospitalizations, surgeries, testing procedures, and complaints, the ALJ shifted his focus to opinion evidence. (AR 32-34.) First, the ALJ gave "great weight to the reconsideration State agency opinion and little weight to the initial State agency opinion." (AR 34.) He noted that Plaintiff's "significant procedures for her medical conditions . . . support[] a finding of severe physical impairments." (*Id.*) However, he ultimately found the "reconsideration State agency opinion for a sedentary range of work is generally supported," particularly given the "consultant['s] not[ation that Plaintiff] was able to care for two young children despite her impairments." (*Id.*) Given Plaintiff's obesity, the ALJ also found the reconsideration State agency opinion's hazard restrictions to be appropriate. (*Id.*)

Turning to Dr. Bridgeman's medical opinion, the ALJ rejected his opinion and "[gave] no weight to [the Doctor's] headache questionnaire." (AR 34.) The ALJ supported his decision not to consider Dr. Bridgeman's opinion on grounds that while "Dr. Bridgeman describes debilitating and disabling headaches, [ ] he relies heavily on [Plaintiff's] complaints and little on objective medical findings or other evidence of [Plaintiff's] activities of daily living." (*Id.*) Thus, after finding Plaintiff's and her husband's testimony only partially credible (*id.*), the ALJ found the sedentary residual functional capacity assessment was "supported by the evidence as a whole" (AR 35).

At step four, the ALJ determined that Plaintiff is capable of performing her past relevant work as a job development specialist and residential counselor. (AR 35.) The ALJ based this determination on the testimony of a vocational expert, and found that the Plaintiff is able to perform her past relevant work as generally performed, though not as she actually performed it. (*Id.*) Alternatively, the ALJ found that at step five, "there are other jobs that exist in significant numbers in the national

economy that the [Plaintiff] also can perform," such as an addresser, a callout operator, or a surveillance system monitor. (*Id.*) Thus, the ALJ concluded that Plaintiff has not been under a disability within the meaning of the Social Security Act between August 31, 2007, and the date of the decision. (AR 36.) Consequently, the ALJ denied Plaintiff's claims for disability benefits. (AR 37.)

In a letter dated September 30, 2014, Plaintiff requested that the Appeals Council review the ALJ's decision. (AR 23.) The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security. (AR 4.) Plaintiff now seeks judicial review of the ALJ's denial of her disability claims under 42 U.S.C. § 405(g). (ECF No. 1.)

## II.    LEGAL STANDARD

The Social Security Act permits any applicant for social security disability benefits to obtain judicial review of the Commissioner's final decision in federal district court. 42 U.S.C. § 405(g). However, "[a]s with other agency decisions, federal court review of social security determinations is limited." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). Thus, the district court "will disturb the denial of benefits only if the decision 'contains legal error or is not supported by substantial evidence.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007)).

"Substantial evidence means more than a mere scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Trevizo v. Berryhill*, 862 F.3d 987, 996 (9th Cir. 2017) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). The ALJ—not the court—is responsible for making credibility determinations, resolving conflicts in medical testimony, and otherwise resolving evidentiary ambiguities. *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Therefore, "[i]f the evidence can reasonably support either affirming or

reversing a decision, [the court] may not substitute [its] judgment for that of the Commissioner." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).

In making its determination, the court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Trevizo*, 862 F.3d at 997 (quoting *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014)). The court's scope of review is limited, as it "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he [or she] did not rely." *Id.* (quoting *Garrison*, 759 F.3d at 1010).

## III. DISCUSSION

Plaintiff raises two arguments to challenge the ALJ's determination that she is not disabled. First, Plaintiff contends that the ALJ committed a legal error when he failed to sufficiently justify disregarding the medical testimony of Plaintiff's treating physician, Dr. Bridgeman.[3] (Pl.'s Mot. at 3:8-9.) Second, Plaintiff argues that the ALJ improperly weighed the opinion of a State agency and non-examining physician, Dr. Yee. (*Id.* at 7:7-8.) The parties also dispute the appropriate remedy, in the event that the Court concludes that the ALJ committed legal error. (*Id.* at 8:3-5.) The Court will address each issue in turn.

//
//
//
//

---

[3] Plaintiff's Motion for Summary Judgment identifies her treating physician as Dr. Joseph Bridgeman. Because the evidence presented in the Administrative Record identifies Plaintiff's treating physician as Dr. David Bridgeman, the Court infers that where Plaintiff's Motion identifies her treating physician as Joseph Bridgeman, the Motion is referring to David Bridgeman. The Court further notes that where Plaintiff's Motion misidentifies Plaintiff as Joseph Bridgeman, the Court assumes that Plaintiff is referring to herself, Tracey Parker.

**A. The ALJ Committed Legal Error by Failing to Provide Sufficient Justification for Giving No Weight to Treating Physician Dr. Bridgeman's Medical Opinion.**

Dr. Bridgeman has treated Plaintiff since June 2009. (AR 1558.) As mentioned above, he completed an Impairment Questionnaire indicating that Plaintiff suffers from "severely intense" headaches that are exacerbated by moving around and that occur hourly, lasting anywhere from ten minutes to one hour. (AR 1559.) Dr. Bridgeman opined that due to this condition, Plaintiff is unable to push, pull, kneel, bend, or stoop and would need a break from the workplace whenever she experiences a headache. (AR 1562.) Dr. Bridgeman advised that Plaintiff would miss work more than three times a month, and she experiences constant interferences with concentration and attention due to pain. (AR 1561-62.) Though Dr. Bridgeman had been treating Plaintiff for nearly five years, the ALJ gave his opinion no weight. (AR 34.) Plaintiff argues that this constitutes legal error because the ALJ failed to give sufficient justification for rejecting Dr. Bridgeman's medical opinion. The Court agrees.

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (footnote omitted). Generally a treating physician's opinion is afforded the most weight and is controlling if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the claimant's record. 20 C.F.R. § 404.1527(c)(2). However, the treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th 2004) (quoting *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)); *see also* 20

C.F.R. § 404.1527. When the treating source's opinion is not given controlling weight, a multi-factor test is used to determine the proper weight to give to the treating source's medical opinion. 20 C.F.R. § 404.1527(c)(2).[4]

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Trevizo*, 862 F.3d at 997 (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). However, even when the treating physician's opinion is contradicted by other doctors' opinions, an ALJ's rejection of the treating physician's opinion may only be upheld if it contains "specific and legitimate reasons that are supported by substantial evidence" in the record. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Trevizo*, 862 F.3d at 997 (quoting *Magallanes*, 881 F.2d at 751). "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012-13.

Here, the Court will apply the "specific and legitimate" standard to the ALJ's rejection of Dr. Bridgeman's opinion.[5] The ALJ provided only the following

---

[4] The multi-factor test considers the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the medical opinion, the degree of consistency between the medical opinion and the record as a whole, the physician's specialization, and other relevant factors that support or contradict the medical opinion. 20 C.F.R. § 404.1527(c)(2)-(6).

[5] The ALJ made no assertion as to whether Dr. Bridgeman's medical opinion was contradicted by the non-examining physicians' opinions. (*See generally* AR 25-37.) However, because the Court concludes that the ALJ committed legal error in rejecting Dr. Bridgeman's opinion even under the more lenient "specific and legitimate" standard, the Court need not determine whether the "clear and convincing" standard applies instead of this standard. *See, e.g.*, *Lapeirre-Gutt v. Astrue*, 382 Fed. App'x 662, 665 (9th Cir. 2010).

explanation for completely rejecting Dr. Bridgeman's opinion: "Dr. Bridgeman describes debilitating and disabling headaches, but he relies heavily on [Plaintiff's] complaints and little on objective medical findings or other evidence of [Plaintiff's] activities of daily living." (AR 34.) The Court will consider the ALJ's two reasons for rejecting Dr. Bridgeman's opinion in turn.

First, "[i]f a treating provider's opinions are based 'to a large extent' on an applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not credible, the ALJ may discount the treating provider's opinion." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (quoting *Tommasetti*, 533 F.3d at 1041); *see also Tonapetyan*, 242 F.3d at 1149 ("Because the . . . record supports the ALJ in discounting [the claimant's] credibility, . . . he was free to disregard [the treating physician's] opinion, which was premised on [the claimant's] subjective complaints."). However, "when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Id.* (citing *Ryan*, 528 F.3d at 1199-00).

Here, the ALJ concluded that Plaintiff was only "partially credible." (AR 34.) However, though the ALJ states that Dr. Bridgeman's opinion relied "heavily" on Plaintiff's complaints, "the ALJ offered no basis for his conclusion that these opinions were based more heavily on [Plaintiff]'s self-reports," *see Ghanim*, 763 F.3d at 1162. Further, substantial evidence does not support the conclusion that Dr. Bridgeman primarily formed his medical opinion by relying on Plaintiff's subjective complaints. Rather, the record shows that Dr. Bridgeman has been Plaintiff's treating physician since June 2009 (AR 1558), and he was the only physician treating Plaintiff's headaches at the time of the hearing (AR 51). Dr. Bridgeman examined Plaintiff multiple times, and he worked with her to manage her symptoms with NSAIDS, muscle relaxers, narcotics, lidoderm patches, Percocet, Valium, OxyContin, and Dilaudid. (AR 1542, 1544, 1555.) His notes indicate that he was not basing his assessments solely on Plaintiff's complaints, but rather considering her

complaints in light of objective medical evidence, including physical examinations, medical imaging, and Plaintiff's treatment history. (*See, e.g.*, AR 1536-38, 1540-44.)

For instance, on January 6, 2014, Dr. Bridgeman noted that though Plaintiff's imaging showed no "significant abnormality except mild [degenerative disk disease] of the C-spine," her previous spinal injections were not relieving her pain, which he recorded as a 10/10. (AR 1542.) In his review of her systems, he found that Plaintiff tested positive for both headache and neck pain. (AR 1544.) This informed his decision to prescribe OxyContin and Dilaudid for her pain. (*Id.*) A week later, Dr. Bridgeman performed a physical exam and noted that Plaintiff's spine was tender and her range of motion was limited. (AR 1540.) As Plaintiff's pain was still at an 8/10, he decided to increase her OxyContin dosage. (AR 1541.) On January 20, 2014, he found Plaintiff presented with "much improve[ment]" to her headaches with the higher OxyContin dosage (AR 1536), and found no positive findings during his physical exam (AR 1536-37). He found her Chiari syndrome to be stable, and he instructed her to continue her medications for both the Chiari malformation and her chronic pain. (AR 1538.) At this point—only three months before the hearing—Plaintiff's medications included Dilaudid, Effexor, OxyContin, Valium, Xanax, and Zofran. (AR 1536.) Thus, though Dr. Bridgeman's evaluation and notes consider Plaintiff's subjective complaints, they also include his "observations, diagnoses, and prescriptions." *See Ghanim*, 763 F.3d at 1162. The ALJ failed to articulate his reasons for, and substantial evidence does not support, his conclusion that Dr. Bridgeman's medical opinion in the Impairment Questionnaire was based more heavily on Plaintiff's subjective complaints than on clinical evidence. Therefore, Dr. Bridgeman's consideration of Plaintiff's subjective reports is not a sufficient basis for the ALJ rejecting his medical opinion as to Plaintiff's condition and functional capacity.

Next, the ALJ noted that Dr. Bridgeman relied "little on objective medical findings." (AR 34.) This statement also fails to provide an adequate basis for rejecting

Dr. Bridgeman's opinion. Merely saying "that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity . . . required" for rejecting a treating physician's opinion in the Ninth Circuit. *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988) (finding the ALJ's approach "inadequate" when the ALJ only "state[d] that the objective factors point toward an adverse conclusion and [made] no effort to relate any of these objective factors to any of the specific medical opinions and findings he reject[ed]").

Here, in determining Plaintiff's RFC, the ALJ gave no specific reasons for rejecting Dr. Bridgeman's opinion that Plaintiff's prognosis is "poor." (AR 34, 1562.) Similarly, the ALJ gave no explanation for his disagreement with Dr. Bridgeman's conclusion that when Plaintiff has a headache, she would be precluded from performing even basic work activities and need a break from work, thus leading to the doctor's estimation that Plaintiff would be absent from work more than three times per month. (AR 34, 1562.) The ALJ also gave no reason for disagreeing with Dr. Bridgeman's recommendation that Plaintiff needs to avoid heights, pushing, pulling, kneeling, bending, and stooping. (AR 34, 1562.) Additionally, the ALJ failed to address the fact that Dr. Bridgeman advised that Plaintiff would be absent from work more than three times per month due to her condition (AR 1562), which, according to the Vocational Expert who testified at the hearing, such absences would prevent Plaintiff from doing her "past relevant work or any other work" (AR 87).

Finally, the ALJ rejects Dr. Bridgeman's opinion because the doctor relied "little on . . . other evidence of the claimant's activities of daily living." (AR 34.) An ALJ may reject or give limited weight to a treating physician's opinion due to inconsistencies between the opinion and the claimant's daily activities. *See Garner v. Colvin*, 626 Fed. App'x 699, 702 (9th Cir. 2015). Even then, the ALJ must "properly explain[ ] [his or her] reasoning for rejecting some of [the treating physician's] opinions while accepting others." *Id.* Here, the ALJ only dealt with

Plaintiff's daily activities as they related to the credibility determination—not as they related to rejecting Dr. Bridgeman's opinion. (AR 34.) Thus, even insofar as the ALJ was attempting to reject Dr. Bridgeman's opinion as inconsistent with Plaintiff's daily activities, the Court finds that the ALJ erroneously failed to properly explain his reason(s) for doing so.

Defendant argues in its motion that the ALJ was not required to accept Dr. Bridgeman's "brief and conclusory" opinions in the questionnaire and cites to cases that reject doctors' opinions because they were "self-contradictory" and contained "internal inconsistencies." (Def.'s Mot. 6:1-13.) However, the ALJ mentioned no such reasons for discounting Dr. Bridgeman's opinion. (*See generally*, AR 25-37.) Because this Court "reviews only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely," the Court does not address this argument. *See Trevizo*, 862 F.3d at 997 (quoting *Garrison*, 759 F.3d at 1010).

Further, the Court is unconvinced by Defendant's assertion that the ALJ properly rejected Dr. Bridgeman's opinion because "[t]here is nothing in the medical evidence to support Dr. Bridgeman's assessment and findings" of disabling headaches and Plaintiff's physical and imaging exams were normal. (Def.'s Mot. 6:25-26.) First, individuals claiming disability due to headaches face a "substantial hurdle" in that "migraine headaches cannot be evidenced by imaging studies, laboratory tests or other ordinary 'objective' evidence." *Dalley v. Comm'r of Soc. Sec.*, No. C 00-01687 VRW, 2006 WL 2578269, at *6 (N.D. Cal. Sept. 6, 2006). That hurdle is compounded by the fact that "the occurrence of cyclical, severe headaches does not match up with the checklists or forms used for determining residual functional capacity . . . in the social security context." *Id.* at *7 (noting that "migraine headaches are a common malady that are readily diagnosed through the evaluation of symptoms" and "[t]hey are difficult to control with or without medication"). Thus, the fact that some of Plaintiff's physical and imaging exams were normal is not a

sufficient basis for rejecting Dr. Bridgeman's assessment that Plaintiff experiences disabling headaches.

Second, even though Dr. Bridgeman noted that Plaintiff's headaches improved with a new prescription for OxyContin and Dilaudid, that improvement does not beget the conclusion that Plaintiff is not disabled. *See, e.g.*, *Hansen v. Colvin*, No. 15-CV-00190-REB, 2016 WL 4582041, at *5 (D. Idaho, Sept. 1, 2016) (finding that the ALJ erred in concluding that claimant's headaches were not severe when the ALJ relied on the treating physician's statement that a combination of medications was "effective" in controlling the claimant's headaches); *Lannon v. Comm'r of Soc. Sec. Admin.*, No. CV-16-00052-PHX-DLR, 2017 WL 541319, at *4 (D. Ariz. Feb. 10, 2017) (finding that the ALJ erred in concluding that the claimant's headaches were "under control with medication" when the treating physician's headache questionnaire indicated that the claimant's response to headache medication was good, but he still opined that the headaches would interfere with her work ability and cause her to miss more than one day per week).

In deciding to completely reject Dr. Bridgeman's opinion, the ALJ failed to set out "a detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings." *See Trevizo*, 862 F.3d at 997. Thus, the Court finds that the ALJ failed to provide "specific and legitimate reasons that are supported by substantial evidence" in his decision to reject the opinion of Dr. Bridgeman, Plaintiff's treating physician. *See Burrell*, 775 F.3d at 1137 (quoting *Bayliss*, 427 F.3d at 1216). Consequently, the Court concludes that the ALJ committed legal error in rejecting the medical opinion of Plaintiff's treating physician.

//
//
//
//

**B.** **The ALJ Committed Legal Error by Improperly Weighing a Non-Examining Physician's Opinion.**

Plaintiff also argues that the ALJ committed legal error by improperly affording greater weight to a non-examining physician's opinion. (Pl.'s Mot. at 7:7-8.) "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Garrison*, 759 F.3d at 1012 (quoting *Lester*, 81 F.3d at 830). "When a nonexamining physician's opinion contradicts an examining physician's opinion and the ALJ gives greater weight to the nonexamining physician's opinion, the ALJ must articulate her reasons for doing so." *See Feskens v. Astue*, 804 F. Supp. 2d 1105, 1115 (D. Or. 2011) (citing *Morgan v. Comm'r of Soc. Sec. Admin*, 169 F.3d 595, 600-01 (9th Cir. 1999)). More specifically, an ALJ errs when he or she "accord[s] greater weight to the opinion of a non-examining, non-treating physician than to the opinions of [a claimant's] treating and examining physicians without providing 'specific' and 'legitimate' reasons supported by 'substantial evidence in the record' for doing so." *Cain v. Barnhart*, 74 Fed. App'x 755, 756 (9th Cir. 2003) (citing *Lester*, 81 F.3d at 830-31).

In *Cain v. Barnhart*, the Ninth Circuit rejected an ALJ's exclusion of a claimant's treating and examining physicians' opinions in favor of a non-examining physician when the ALJ credited the non-examining physician's testimony because it was "consistent with the objective evidence of record for the period at issue." 74 Fed. App'x at 757. This "conclusory statement about objective evidence in the record (to which he did not point)" was an insufficient reason to credit the non-examining physician's opinion over the treating and examining physicians' opinions. *See id.* Likewise, the Court finds that the ALJ's statement that "[t]he reconsideration State agency opinion for a sedentary range of work is generally supported" is not a specific and legitimate reason for crediting Dr. Yee's physical RFC recommendation over that of Dr. Bridgeman.

Further, the ALJ's statement that "[t]he consultant noted the claimant was able to care for two young children despite her impairments" is a mischaracterization of the record. Rather, in the "Findings of Fact and Analysis of Evidence" portion of the assessment, the consultant merely quoted Plaintiff's appeal application, stating: "daughter in kindergarten, youngest son 7 mths; more mobile, having to do more, increased activity causes increased pain, have to sit down frequently between taking care of my family." (AR 130.) While the consultant later found that Plaintiff is "able to care for 2 young children" (AR 131), this opinion was based off of Plaintiff's own application, which does not describe an ability to adequately care for her children, but rather the pain and difficulty she experiences when trying to do so. (*See* AR 291 ("My husband works nights so he can be here during the day to help me with taking care of me and the kids . . . . With all the increased activity I have increased pain. I have to sit down frequently in between taking care of my family. . . . I don't drive much anymore because I am afraid all the head turning will cause pain and numbness. I am unable to really be a fun part of my famil[y's] lives since I can't play with my daughters unless I am sitting and take breaks often.").)

Thus, the Court finds that the ALJ erred when he afforded greater weight to Dr. Yee's opinions—a non-examining, non-treating physician—than those of Dr. Bridgeman, without providing "'specific' and 'legitimate' reasons supported by 'substantial evidence in the record'" for doing so." *See Cain*, 74 Fed. App'x at 756 (quoting *Lester*, 81 F.3d at 830-31).

## C.     The Matter Will Be Remanded for an Award of Benefits.

The ALJ committed legal error in his RFC assessment by failing to adequately explain why he completely rejected the medical opinion of Plaintiff's treating physician and instead afforded great weight to the medical opinion of a non-treating, non-examining State agency consultant, again without sufficient explanation. Because the Court concludes that this constitutes harmful legal error, the Court now

turns to the appropriate remedy. Plaintiff argues that the Court should reverse and remand for payment of benefits because the "credit as true rule" requires that Dr. Bridgeman's opinion be credited as a matter of law, thereby compelling the conclusion that Plaintiff is disabled. (Pl.'s Mot. at 7:20-8:3.)

"Usually, '[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded'" for additional proceedings. *See Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)). However, a court may depart from this ordinary remand rule, and instead remand for the calculation and award of benefits, when the three requirements of the "credit-as-true" rule are satisfied. *Id.* at 1019-21. First, the court must determine that the ALJ committed legal error, such as by failing to provide legally sufficient reasons for rejecting evidence. *Dominguez*, 808 F.3d at 407. Second, if the court finds such error, it must determine whether "the record has been fully developed and further administrative proceedings would serve no useful purpose." *Garrison*, 759 F.3d at 1020. In making this determination, the court reviews the record as whole and asks whether there are conflicts, ambiguities, or gaps in the record such that essential factual issues have not been resolved. *Dominguez*, 808 F.3d at 407. Where there are outstanding issues that require resolution, the proper approach is to remand the case to the agency for further proceedings. *Treichler*, 775 F.3d at 1101, 1105.

If the court determines that the record has been fully developed and there are no outstanding issues left to be resolved, the court must next consider whether "the ALJ would be required to find the claimant disabled on remand" if the "improperly discredited evidence were credited as true." *Dominguez*, 808 F.3d at 407 (quoting *Garrison*, 759 F.3d at 1020). "If so, the district court may exercise its discretion to remand the case for an award of benefits." *Id.* However, even when the requirements of the credit-as-true rule are satisfied, district courts retain flexibility to remand for further proceedings when the record as a whole creates "serious doubt" as to whether

the claimant is, in fact, disabled. *Id.* at 1021. "The touchstone for an award of benefits is the existence of a disability, not the agency's legal error." *Brown–Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015).

Remanding for an award of benefits is warranted here because (i) all three conditions of the credit-as-true rule are satisfied and (ii) there is not a serious doubt as to whether Plaintiff is disabled. Initially, the first requirement for the credit-as-true rule is met. The Court has already explained at length why the ALJ failed to provide a legally sufficient basis to reject the medical opinion of Plaintiff's treating physician Dr. Bridgeman.

Second, the Court is satisfied that the record has been fully developed and that further administrative proceedings would serve no useful purpose. Defendant argues that even if Plaintiff suffers from chronic headaches, "there is no supporting medical opinion to support disabling impairments, other than Dr. Bridgeman's headache questionnaire." (Def.'s Mot. at 10:21-27.) Thus, Defendant claims "further proceedings would be required in order to assess Plaintiff's nonexertional limitations for any attention/concentration issues, which must be resolved before a determination of disability can be made." (*Id.* at 10:28-11:2.) The Court rejects this argument. The gaps Defendant perceives in the record are those items already addressed by Dr. Bridgeman in his questionnaire. Therefore, Defendant's argument is contingent upon the Court finding the ALJ properly rejected Dr. Bridgeman's opinion. Because the ALJ did not do so, further proceedings are not necessary to explore those issues Dr. Bridgeman already addressed in his questionnaire.

In addition, as further discussed below, the vocational expert already provided testimony on Plaintiff's workplace limitations, including a key limitation identified by Dr. Bridgeman in his improperly rejected opinion. Hence, unlike other cases, remanding for further proceedings is not necessary to allow a vocational expert to address improperly discredited limitations. *See, e.g.*, *Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000) ("In cases where the testimony of the vocational expert

has failed to address a claimant's limitations as established by improperly discredited evidence, we consistently have remanded for further proceedings rather than payment of benefits."); *see also Graham v. Colvin*, No. C14-5311BHS, 2015 WL 509824, at *7 (W.D. Wash. Feb. 6, 2015) (remanding for further proceedings where there was a "lack of vocational expert testimony based on the limitations" contained in improperly discredited evidence).

Third, the ALJ would be required to find Plaintiff disabled on remand if Dr. Bridgeman's improperly discredited opinion was credited as true. Dr. Bridgeman found, among other things, that Plaintiff would be required to miss more than three days of work per month due to her severe headaches. When the vocational expert was asked if a hypothetical individual with this limitation could "do the claimant's past relevant work or any other work," the expert testified, "No." (AR 87.) Consequently, when Dr. Bridgeman's opinion is credited as true and considered in light of the vocational expert's testimony, the ALJ would be required to find Plaintiff disabled on remand. *See, e.g.*, *Henderson v. Berryhill*, No. 15-16037, --- Fed. App'x ---, 2017 WL 2211273, at *2 (9th Cir. May 19, 2017) (reasoning that a vocational expert's testimony that a person with the claimant's impairments could not work "is a sufficient basis upon which to remand for determination of benefits"); *Behling v. Colvin*, 603 F. App'x 541, 544 (9th Cir. 2015) (noting where a vocational expert found limitations rendered the claimant disabled, but the ALJ improperly rejected the treating physician's opinion that supplied these limitations, "the ALJ would be required to make a finding that [the claimant] was disabled on remand" in "light of the vocational expert's testimony"); *Mongelluzzo v. Colvin*, 17 F. Supp. 3d 914, 931 (D. Ariz. 2014) (same).

Accordingly, the three requirements for the credit-as-true rule are satisfied, and remanding for the calculation and award of benefits is warranted unless the record as a whole creates "serious doubt" as to whether Plaintiff is, in fact, disabled. *See Garrison*, 759 F.3d at 1021. Having reviewed the record, the Court finds that

although there may be some doubt as to whether Plaintiff is disabled, there is not a serious doubt. On the one hand, Plaintiff has been repeatedly diagnosed as suffering from severe headaches. She underwent a "complex" neurosurgery that involved risk to try to obtain relief, as well as multiple follow-up procedures to repair cerebral spinal fluid leakage. (AR 525; *see also* AR 500, 510, 1355, 1298-99, 1278-81.) She later sought emergency relief at hospitals multiple times, where attending physicians concluded she suffered from severe headaches. In addition, Plaintiff's primary physician—who treated her throughout these events—confirmed she continues to suffer from severe headaches despite surgery, spinal injections, and medication. He also opined that these headaches make Plaintiff incapable of tolerating even low work stress and would cause her to miss work more than three times a month. These limitations, in conjunction with the vocational expert's testimony, demonstrate Plaintiff is disabled.

On the other hand, Plaintiff experienced periods of improvement where she reported not suffering from headaches or an improvement in her symptoms. The ALJ also found—albeit unconvincingly—that Plaintiff is only partially credible. This evidence creates some doubt that Plaintiff is, in fact, disabled. That being said, the Court finds this doubt does not amount to a serious one in light of the remainder of the record. Accordingly, the Court will remand for the calculation and award of benefits. *See Garrison*, 759 F.3d at 1021.

## IV.   **CONCLUSION**

In light of the foregoing, the ALJ erred in completely rejecting Dr. Bridgeman's medical opinion in his assessment of Plaintiff's RFC, and thus erred in rejecting Plaintiff's application for disability benefits at step four of the five-step sequential analysis and alternatively at step five of the analysis. The Court finds that the ALJ failed to provide "specific and legitimate reasons that are supported by substantial evidence" in his decision to reject the opinion of Dr. Bridgeman,

Plaintiff's treating physician in favor of affording more weight to the medical opinion of a non-examining, non-treating physician. *See Burrell*, 775 F.3d at 1137 (quoting *Bayliss*, 427 F.3d at 1216); *Cain*, 74 Fed. App'x at 756 (quoting *Lester*, 81 F.3d at 830-31). Further, the Court concludes the requirements for the credit-as-true rule are satisfied, and there is not a serious doubt as to whether Plaintiff is, in fact, disabled. *See Garrison*, 759 F.3d at 1023.

Accordingly, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (ECF No. 19) and **DENIES** Defendant's Cross-Motion for Summary Judgment (ECF No. 23). Finally, the Court **REMANDS** this action for the calculation and award of benefits.

**IT IS SO ORDERED.**


**DATED: August 25, 2017**

Hon. Cynthia Bashant
United States District Judge